UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Joseph McClennon,

    Plaintiff,        Civ. No. 10-2598 (RHK/JJK)
                 **MEMORANDUM OPINION**
                 **AND ORDER**
v.

Matthew Kipke, *et al.*,

    Defendants.

Peter J. Nickitas, Peter J. Nickitas Law Office, LLC, Minneapolis, Minnesota, Mark D. Luther, Mark Luther Law Office, Minnetonka, Minnesota, for Plaintiff.

Sara J. Lathrop, Amanda M. Trelstad, Susan L. Segal, Minneapolis City Attorney's Office, Minneapolis, Minnesota, for Defendants.

**INTRODUCTION**

   This case arises out of Plaintiff Joseph McClennon's December 20, 2006, arrest by Minneapolis police officers – on that, the parties agree. Otherwise, their stories differ greatly. McClennon asserts that the officers – Defendants Matthew Kipke, Paul Schweiger, James Carroll, and Chad Hofius – lacked probable cause to arrest him and subjected him to excessive force in effecting his arrest. The officers contend that McClennon was a belligerent suspect who attempted to assault them, ultimately requiring the use of a Taser before he could be subdued. In this action, McClennon asserts claims under the United States Constitution and Minnesota law arising out of his arrest;

Defendants now move for summary judgment. For the reasons set forth below, their Motion will be granted in part and denied in part.

## BACKGROUND

As required at this juncture, the pertinent facts are recited below in the light most favorable to McClennon. E.g., Rau v. Roberts, 640 F.3d 324, 327 (8th Cir. 2011).

On December 21, 2006, McClennon was residing with his aunt, Victoria Johnson, at her home near the intersection of Penn Avenue North and 30th Street in Minneapolis. (McClennon Dep. at 8, 26, 30-31.)[1] Early that evening, he was standing on the "boulevard," a grassy strip between 30th Street and the sidewalk in front of Johnson's home, waiting for his girlfriend to pick him up; while waiting, he chatted with his cousin, Blake Harris, through an upstairs window. (Id. at 26-28.)

As McClennon was standing on the boulevard, a police car driven by Schweiger (and in which Carroll was a passenger) slowly drove down the opposite side of 30th Street. (Id. at 29; Schweiger Dep. at 7-8, 15.) Schweiger stuck his head out of the car's window and "stared down" McClennon. (McClennon Dep. at 29, 33.) McClennon asked Schweiger if there was a problem, and Schweiger backed up the squad car and parked in front of Johnson's home. (Id. at 33.) McClennon then walked from the boulevard to Johnson's lawn, at which point Schweiger grabbed him and "forcibly" pushed him against the hood of the squad car. (Id. at 33-35.) He then began searching McClennon. (Id. at 35.)

---

[1] McClennon was deposed in this action and in a related action brought by Johnson. References to "McClennon Dep." are to the transcript of McClennon's deposition in *this* case, dated May 25, 2011, which is attached to the Affidavit of defense counsel, Sara J. Lathrop, as Exhibit 2.

Schweiger emptied McClennon's pockets as another police car, driven by Hofius (and in which Kipke was a passenger), arrived on the scene. (Id. at 36; Hofius Dep. at 9-10.) Schweiger removed some papers, a key chain, a "do rag," and an identification card from McClennon's pockets and placed them onto the hood of his car, and he then placed McClennon into the back seat. (McClennon Dep. at 37.) According to Schweiger, McClennon had a small marijuana pipe on his keychain, although McClennon disputes that assertion. (Schweiger Dep. at 20-21; McClennon Dep. at 38.) Regardless, Schweiger began to write McClennon a citation for possession of drug paraphernalia. (Schweiger Dep. at 22; McClennon Dep. at 40.) Meanwhile, Harris informed Johnson that McClennon was being arrested. Johnson, Harris, and two other family members came out of Johnson's home and began asking the officers what McClennon had done wrong. (McClennon Dep. at 38-39.) Hofius "wouldn't tell [Johnson] anything, and then he called her ignorant." (Id. at 39.)

Eventually, Schweiger released McClennon from the squad car and handed the citation to him, which McClennon "grabbed." (Id. at 40.) As he began walking toward Johnson's house, Johnson reminded him that his belongings remained on the hood of Schweiger's car. (Id.) McClennon turned around, walked back to the car, and began gathering the items that had been removed from his pockets; Schweiger then started to flick them off the hood with a flashlight. (Id.) As McClennon reached for his possessions, the flashlight hit him "on [his] knuckles . . . pretty hard," and he reacted by "push[ing] the flashlight back" with his fingers. (Id.)

- 3 -

In response, Schweiger grabbed McClennon in a "bear hug" while another officer grabbed him from behind, lifting his arms over his head in a "full-nelson." (Id. at 41-43.) A third officer then grabbed McClennon from the side. (Id. at 43.) The officers' actions caused McClennon to "spin" towards the ground (id. at 43-45, 50), and one of the officers called out, "Ta[s]e him." (Id. at 45.)[2] Johnson, who had been watching the events unfold, ran to McClennon and jumped on him, telling him to get on the ground. (Id. at 45, 47-48.) The officers "threw" Johnson off McClennon, and Carroll then Tasered McClennon. (Id. at 55.) When Johnson jumped on top of McClennon a second time, officers threw her off again and maced her. (Id. at 59.) The officers then lifted McClennon from the ground; Hofius handcuffed him, informed him that he was under arrest, and placed him in the back of Schweiger's squad car. (Id. at 61-62; Hofius Dep. at 15-16.)[3]

---

[2] A "Taser" is an "electronic control device that discharges two probes on a target when its trigger is pulled." United States v. Drapeau, 644 F.3d 646, 650 n.2 (8th Cir. 2011). The probes penetrate the target's skin up to ½ inch deep; they are connected to the Taser by wires, which can deliver a 50,000-volt shock lasting up to five seconds and causing "electrical muscular disruption" in the target. McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011). "Taser" is an acronym for "Thomas A. Swift's Electric Rifle," an homage by its inventor, Jack Cover, to "the science-fiction teenage inventor and adventurer character, Tom Swift." Gosserand v. Parish of Jefferson, Civ. A. No. 05-5005, 2006 WL 3247113, at *1 n.1 (E.D. La. Nov. 7, 2006).

[3] Suffice it to say, Defendants paint a very different picture of McClennon's conduct. They assert that McClennon was standing near a parked car when Schweiger drove by and appeared surprised by the police car's presence, rapidly turning around and walking away. Schweiger suspected McClennon might be breaking into the car and made eye contact with him, to which McClennon responded, "What the fuck are you looking at?" Schweiger then stopped his squad car and observed McClennon put his hands in his pockets as if he were hiding something. After refusing twice to remove his hands from his pockets, Schweiger performed a "protective search" and emptied the contents of McClennon's pockets onto the car's hood, revealing a marijuana pipe. He placed McClennon into his squad car, wrote him a citation, and released him. McClennon walked towards Johnson's home but then turned around, yelled obscenities at the

McClennon was charged with a gross misdemeanor of obstructing legal process and held overnight in the Hennepin County Jail; he was released the following day, December 21, 2006. (Lathrop Aff. Exs. 5, 12.) The charge was later dropped when the officers failed to appear at a court hearing. (Cole Dep. at 11.) After learning that the officers had not been advised of the hearing date, however, the prosecutor re-charged the case and McClennon was arrested on the charge a second time. (See Cole Dep. at 14; Lathrop Aff. Ex. 13.) The case was subsequently dismissed, for reasons not entirely clear from the record.

On June 24, 2010, McClennon commenced this action against Schweiger, Carroll, Hofius, and Kipke (the "Individual Defendants"), as well as the City of Minneapolis (the "City"), asserting six claims: unreasonable seizure (Count I) and excessive force (Count II) in violation of the Fourth Amendment, against the Individual Defendants;[4] malicious prosecution (Count III), abuse of process (Count IV), and negligence (Count VI), against all Defendants; and false imprisonment (Count V), against the City alone. Each

---

officers, and grabbed for his possessions on the hood of Schweiger's car. He then pushed Schweiger and began throwing punches at him, and Hofius and Carroll came to Schweiger's aid. McClennon fell to the ground in the scuffle and, as the officers attempted to handcuff him, Johnson jumped on top of him. The officers removed her, and seeing McClennon still combative on the ground, Kipke deployed his Taser. Hofius was then able to handcuff and arrest McClennon. For purposes of this Motion only, the Court assumes the truth of McClennon's version of events, rather than Defendants'.

[4] Although the Complaint alleges that the Individual Defendants' conduct violated the Fourth *and* Fourteenth Amendments, this is but two different ways of stating the same claim, since the Fourth Amendment is made applicable to state actors through the Fourteenth Amendment's Due Process clause. See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961). Hence, claims of unlawful arrest or excessive force brought against state actors "should be analyzed under the Fourth Amendment," Graham v. Connor, 490 U.S. 386, 395 (1989), and McClennon does not contend otherwise in his brief.

Defendant – save Hofius – was served with the Summons and Complaint shortly after the action was filed.  (See Doc. No. 6.)  Hofius was not served at that time because he was then "on military leave and will not return for approximately a year."  (Doc. No. 6.)  Despite more than 16 months having passed since McClennon commenced his action, it is undisputed that Hofius never has been served with process.

With discovery complete, Defendants have moved for summary judgment.  The Court held a hearing on the Motion on October 26, 2011, and it is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

I.  **Qualified immunity**

The Individual Defendants first argue that they are entitled to qualified immunity on McClennon's federal claims. In analyzing that assertion, the Court must conduct a two-part inquiry. First, it must assess whether the facts alleged, when viewed in the light most favorable to McClennon, show that the challenged conduct violated a constitutional right. If a violation could be established based on those facts, the Court must then determine whether the constitutional right at issue was clearly established on the date in question. E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). As the Supreme Court recently recognized, when undertaking this inquiry the Court may skip Saucier's first step and proceed directly to whether the constitutional right at issue was clearly established when the alleged violation occurred. Pearson v. Callahan, 555 U.S. 223, 235-36 (2009).

  A.  **Excessive force (Count II)**

The Court follows the parties' lead and begins its analysis with McClennon's excessive-force claim. The viability of that claim turns on Saucier's second step, namely, clearly established law. It is undisputed that it was clearly established on December 20, 2006, the date of McClennon's arrest, that an arrestee enjoyed the right to be free from excessive force during an arrest. E.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005). Yet, the Eighth Circuit recently noted that "over the course of more than fifteen years, . . . it . . . remain[ed] an open question in this circuit whether an excessive force claim requires some minimum level of *injury*." Chambers v. Pennycook, 641 F.3d 898,

904 (8th Cir. 2011) (emphasis added). Indeed, different Eighth-Circuit panels had reached different answers to that question since the 1990s. Compare, e.g., Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999) (Kyle, J., sitting by designation) (concluding that a plaintiff may state an excessive-force claim as long as he suffered *some* injury, no matter how minor), and Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995) (same), with Andrews, 417 F.3d at 818 (noting that a "*de minimis* . . . injury is insufficient to support a finding of a constitutional violation"), and Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007 (8th Cir. 2003) (same). Chambers put an end to this uncertainty, holding that the excessive-force inquiry must focus on the force applied and *not* its end result, that is, the level of injury:

> A *de minimis* use of force is insufficient to support a claim, and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use of force. The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used. But it is logically possible to prove an excessive use of *force* that caused only a minor *injury*, and a rule that forecloses a constitutional claim in that circumstance focuses on the wrong question.
>
> The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted. Some plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people. A greater than *de minimis* injury requirement under the Fourth Amendment would mean that the same quantum of force, in the same circumstances, could be unconstitutional when applied to a citizen with a latent weakness and constitutional when applied to a hardier person. The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force. The rule should focus instead on whether *the force applied* is reasonable from the perspective of a reasonable officer on the scene at the time the force is used.

641 F.3d at 906 (citations omitted). Hence, there is no longer any "requirement that a plaintiff show more than *de minimis* injury to establish an application of excessive force." Id. at 907.

But as Chambers noted, the Eighth Circuit's inconsistent decisions had left it unclear for more than a decade whether "an officer violated the rights of an arrestee by applying force that caused only *de minimis* injury." Id. at 908. "Given the state of the law," a reasonable police officer making an arrest before Chambers "could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment." Id. In other words, it was not clearly established pre-Chambers that an officer violated an arrestee's rights, no matter how much force he applied, if he caused only *de minimis* injuries. Id. at 908-09. As a result, the Eighth Circuit determined that the police officers in Chambers, who were accused of excessive force but who caused only *de minimis* injuries, were entitled to qualified immunity because at the time of the plaintiff's arrest (August 2005) it was "reasonable for the officers to believe that they remained within constitutional bounds if that was the result" of their conduct. Id.

Seizing on Chambers, the Individual Defendants argue they are entitled to qualified immunity here because (1) McClennon suffered only *de minimis* injuries and (2) it was not clearly established on December 20, 2006, that inflicting a *de minimis* injury was unconstitutional. (Def. Mem. at 12-17.) The latter assertion cannot seriously be disputed in light of Chambers. And the Court agrees with the former assertion, because case law indicates that McClennon's injuries were *de minimis*.

Notably, McClennon nowhere argued in his brief that he incurred something more than *de minimis* injuries. He claims that he suffered two red spots on his chest from the Taser probes, but he has acknowledged that the spots have since faded. (McClennon Dep. at 54-55.) "[R]elatively minor scrapes and bruises . . . [a]re *de minimis* injuries." Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006).

McClennon also claims, since the incident, that he suffers pain in his shoulder after playing basketball and "tightening" in his chest that he feels the need to "pop." (McClennon Dep. at 67-70.) Yet, he conceded in his deposition that he has never seen a doctor for these conditions, and he has proffered no medical records or other evidence to support them. His bare assertions of shoulder pain and chest tightness, without more, are insufficient to constitute something beyond *de minimis* injuries. See, e.g., Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 & n.5 (8th Cir. 1990) (upholding qualified immunity despite plaintiff's allegation that he suffered nerve damage and pain from being handcuffed too tightly; "We do not believe that Foster's *allegations* of pain as a result of being handcuffed, *without some evidence of more permanent injury*, are sufficient to support his claim of excessive force.") (emphases added); see also Crumley, 324 F.3d at 1008 (no reasonable jury could find excessive force in securing handcuffs, despite plaintiff's allegation they made her hands bleed, when she did not "present any medical records indicating she suffered any long-term or permanent physical injury as a result").[5]

---

[5] At oral argument, McClennon also asserted that the incident caused him pain and soreness in his chest, which resolved approximately one week later. These, too, are *de minimis* injuries. See

- 10 -

Although not expressly argued by him, McClennon also appears to suggest that the officers' application of a Taser necessarily inflicted something more than *de minimis* injury. (See Mem. in Opp'n at 41, 44-45.) But while a Taser delivers a "painful and frightening blow" that can render "even the most pain tolerant individuals utterly limp," McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011), the Eighth Circuit has held that in the absence of evidence of long-term effects, the use of a Taser does "not inflict any serious injury." Cook v. City of Bella Villa, 582 F.3d 840, 851 (8th Cir. 2009); accord, e.g., Luepker v. Taylor, No. 4:09CV1657, 2010 WL 2696701, at *9 (E.D. Mo. July 6, 2010) ("[T]he Court does not believe that the momentary pain and suffering caused by a [T]aser . . . rises above the level of a *de minimis* injury."); Chisolm v. VonDoran, No. 4:08-cv-3242, 2010 WL 625381, at *6 (D.S.C. Feb. 19, 2010); Bailey v. Cnty. of Kittson, Civ. No. 07-1939, 2009 WL 294229, at *22 (D. Minn. Feb. 5, 2009) (Montgomery, J., adopting Report & Recommendation of Erickson, M.J.) ("[W]e conclude that the Plaintiff's excessive force claim fails as a matter of law, because he has failed to demonstrate any actual injury – not even a *de minimis* injury – which resulted from use of the [T]aser gun."); Stanley v. City of Baytown, Tex., No. Civ. A. H-04-2106, 2005 WL 2757370, at *6 (S.D. Tex. Oct. 25, 2005); see also Schumacher v. Halverson, 467 F. Supp. 2d 939, 951 (D. Minn. 2006) (Rosenbaum, J.) (rejecting excessive-force claim predicated on use of Taser because, *inter alia*, it "did not cause any permanent physical injuries, and [plaintiff] did not require any medical or psychological treatment as

---

Andrews, 417 F.3d at 816-18 (sore neck and "horrible, horrible headache" were *de minimis* because they were "nothing more than . . . temporary").

a result"); but see Orsak v. Metro. Airports Comm'n Airport Police Dept., 675 F. Supp. 2d 944, 958 (D. Minn. 2009) (Tunheim, J.) (noting that certain courts have held that "the effects of the [T]aser are more than *de minimis*"). The fact that the officers used a Taser, therefore, cannot save the day for McClennon.

At oral argument, McClennon pointed to four Eighth-Circuit cases purportedly supporting his excessive-force claim. None of those cases is apposite, however. Two – Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009), and Henderson v. Munn, 439 F.3d 497 (8th Cir. 2006) – made no mention of *de minimis* injuries. The third, Bell v. Kansas City Police Department, 635 F.3d 346 (8th Cir. 2011) (*per curiam*), is factually distinguishable because the plaintiff there was hospitalized with an irregular heartbeat after being Tasered. Id. at 347. The final case, Hickey v. Reeder, 12 F.3d 754 (8th Cir. 1993), arose under the Eighth Amendment, not the Fourth Amendment. Hence, the question was not whether the plaintiff had suffered more than *de minimis* injuries, but rather whether he had been subjected to "wanton and unnecessary infliction of *pain*." Id. at 758 (emphasis added). At bottom, none of these cases aids McClennon's cause.[6]

For all of the foregoing reasons, the Court concludes that the injuries suffered by McClennon were *de minimis* as a matter of law. As a result, because it "was not clearly established [in 2006] that an officer violated the rights of an arrestee by applying force

---

[6] McClennon also noted at oral argument that a decision by a panel of the Eighth Circuit must control later decisions by different panels. The Court does not quibble with that notion, see, e.g., Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (*en banc*), but it adds nothing to the mix here because the Eighth Circuit, for two decades, did not adhere to it with respect to *de minimis* injuries. Indeed, this is precisely why Chambers found the law regarding *de minimis* injuries was not clearly established prior to that decision.

that caused only *de minimis* injury," Chambers, 641 F.3d at 908, the officers are entitled to qualified immunity on the excessive-force claim.

### B. Unlawful seizure (Count I)

Before analyzing qualified immunity vis-à-vis the unlawful-seizure claim, it is important to understand precisely what that claim alleged. In the Complaint, McClennon asserted that the Individual Defendants, "jointly and severally, unreasonably seized [him] by his wrongful confinement in the Hennepin County Jail for two days after his unreasonable seizure on December 20, 2006." (Compl. ¶ 24.) In other words, his claim arose out of his *arrest*, for only the arrest led to McClennon being "confine[d] in the Hennepin County Jail."

This understanding is important, because McClennon obfuscates the nature of his claim in his opposition brief. Instead of focusing on his arrest, McClennon keys in on several events *preceding* the arrest, including Schweiger's initial stop and search of McClennon's person and his temporary detention in the squad car while Schweiger wrote the marijuana citation. (See, e.g., Mem. in Opp'n at 33 ("The officers, without any warrant, lack[ed] probable cause to seize McClennon in the first place."); id. at 36 ("Taking the evidence in the most favorable light for McClennon, the officers may stop and converse with McClennon, but they have no probable cause to seize and search him without a warrant.").) The Complaint made clear, however, that Count I concerned only an unlawful *seizure*, not an unlawful *search*; indeed, Count I is captioned "Unreasonable seizure, in violation of Fourth and Fourteenth Amendments." (See also Compl. ¶ 24 ("Defendants . . . unreasonably seized plaintiff . . . .").) Similarly, under no fair reading

can Count I be seen to allege an unlawful seizure related to McClennon's temporary detention in the squad car while Schweiger wrote the marijuana citation. McClennon does not dispute that Schweiger released him after writing the citation, and hence that conduct cannot have led to him being "confine[d] in the Hennepin County Jail."

The Court will not permit McClennon to re-cast the contours of this claim through his summary-judgment brief. See, e.g., Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir.1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment, . . . simply by raising a point in a brief.") (internal citations omitted); Ellering v. Sellstate Realty Sys. Network, Inc., __ F. Supp. 2d __, 2011 WL 2730919, at *8 n.10 (D. Minn. July 13, 2011) (Kyle, J.) (same). The Court's qualified-immunity analysis, therefore, will focus on the claim pleaded in the Complaint, which concerned only McClennon's arrest for obstructing legal process.

The Individual Defendants assert that they are entitled to qualified immunity on this claim because they had "probable cause to believe that [McClennon] committed obstruction of legal process in their presence." (Def. Mem. at 19.)[7] They note that the Minnesota statute criminalizing obstruction of legal process makes it unlawful to "[a]ctively or passively resist[] arrest" (id. (citing Minn. Stat. § 609.50)), and they assert

---

[7] There is no dispute, as of December 20, 2006, that it was clearly established that police officers violated an arrestee's constitutional rights by making a warrantless arrest without probable cause. See, e.g., Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005).

that McClennon "passively resisted" here because "he started spinning as multiple officers attempted to handcuff him." (Id. at 20.)[8] The Court does not agree.

The flaw in the Individual Defendants' argument is that it presupposes McClennon's "spinning" was a voluntary act. They overlook that McClennon denies resisting and testified that he "started spinning" *only because the officers grabbed him and wrestled him to the ground*. (McClennon Dep. at 44 (claiming that he was spinning because an "officer had grabbed [him] from the back [and McClennon] was following his motion"); id. at 44-45 ("[W]hen the other officer grabbed me I got spun.").) Notably, defense counsel appeared to recognize during McClennon's deposition that he was spinning only because of the officers' actions. (See id. at 45 ("Q: *So he spins you around*, and does the officer who gave you the citation come with you as you spin around?") (emphasis added).)

Accepting as true McClennon's assertion that he did not resist the officers or voluntarily spin away from them, as the Court must at this juncture, the Individual Defendants are not entitled to qualified immunity. The officers cannot assert that there existed probable cause to arrest McClennon for obstructing legal process based on his "spinning" when, according to McClennon, he did not undertake that conduct on his own. The crime of obstructing legal process applies only when an individual *intentionally* "obstructs, resists, or interferes with a peace officer." Minn. Stat. § 609.50, subd. 1(2).

---

[8] Notably, the Individual Defendants do *not* rely on McClennon's (purported) possession of a marijuana pipe as the basis for his arrest. (See Reply Mem. at 16 ("Defendants have not argued . . . that possessing drug paraphernalia formed the legal basis for Plaintiff's seizure.").) The only asserted basis for probable cause is McClennon's so-called "resistance."

In the absence of any intentional conduct, no reasonable police officer could have concluded that McClennon engaged in conduct violating the law. See, e.g., Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 817 (8th Cir. 2010) (probable cause determined by "whether the facts and circumstances would have led to a reasonable conclusion that a crime had been committed"). Indeed, were it otherwise, officers could manufacture probable cause by pushing an arrestee and later asserting they enjoyed the right to arrest because the arrestee's movement constituted "resistance." The Court declines to endorse such a result.

For these reasons, the Court concludes that the Individual Defendants are not entitled to qualified immunity on McClennon's unlawful-seizure claim.[9]

## II.   The state-law claims

As noted above, McClennon asserted four state-law claims in his Complaint: malicious prosecution (Count III), abuse of process (Count IV), false imprisonment (Count V), and negligence (Count VI). In his opposition brief, he agreed to voluntarily dismiss the malicious-prosecution claim (Count III). (See Mem. in Opp'n at 45 n.2.) At

---

[9] Each Individual Defendant's conduct must be independently assessed when determining whether qualified immunity exists. E.g., Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805-06 (8th Cir. 2010) (citation omitted). Hence, it is possible that certain Individual Defendants are entitled to immunity on the unlawful-seizure claim while others are not. Notably, Hofius testified that he handcuffed McClennon and took him into custody. (See Hofius Dep. at 15-16.) The extent of the other officers' potential liability for the "unlawful" arrest is, therefore, unclear. Yet, the record suggests that Schweiger and Carroll had at least some responsibility for the arrest. (See Lathrop Aff. Ex. 5 (booking sheet listing Schweiger and Carroll as "arresting officer[s]").) Moreover, the Eighth Circuit has recognized that a police officer with some "direct participation" in an arrest may be held liable if the arrest is later determined unlawful. See, e.g., Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997). And, the Individual Defendants have lumped themselves together in arguing for qualified immunity, rather than assessing their conduct individually. Accordingly, the Court concludes that none of the Individual Defendants is entitled to qualified immunity on the unlawful-seizure claim at this juncture.

oral argument, he also abandoned the abuse-of-process (Count IV) and false-imprisonment (Count V) claims.  Defendants argue that the remaining claim, for negligence, also must be dismissed; the Court agrees.[10]

In his negligence claim, McClennon asserted that the Individual Defendants "breached their duties . . . to refrain from infliction of unreasonable force upon [McClennon's] person."  (Compl. ¶ 41.)  He further asserted that the City is responsible for such negligence under the doctrine of *respondeat superior*.  (Id. ¶ 42.)  Defendants contend they are entitled to official immunity on this claim.[11]  As the undersigned recently noted, official immunity "provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."  Garcia v. Hennepin Healthcare Sys., Inc., Civ. No. 11-1639, 2011 WL 4808200, at *1 (D. Minn. Oct. 11, 2011) (Kyle, J.) (quoting Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d 651, 655 (Minn. 2004)).  There can be no dispute that the amount of force used

---

[10] McClennon failed to respond to Defendants' arguments regarding the negligence claim (and all other state-law claims).  As a result, Defendants assert that McClennon has "waived" that claim, but the Court does not agree.  See Interstate Power Co. v. Kan. City Power & Light Co., 992 F.2d 804, 807 (8th Cir. 1993) ("McKiness contends that KCPL abandoned [certain] claims . . . when it failed to argue those claims in response to the motion for summary judgment.  We disagree.  Even if a motion for summary judgment on a particular claim stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law on that claim.").  Accordingly, it will address this claim on the merits.

[11] Defendants also argue that the negligence claim is really one for battery because "there is no claim under Minnesota law for negligent infliction of excessive force."  (Def. Mem. at 28 (citing Schumann v. McGinn, 240 N.W.2d 525 (Minn. 1976)).)  But Schumann nowhere held that a plaintiff asserting excessive force could not also assert a claim for negligence.  See 240 N.W.2d at 529-30.  And, this Court has previously recognized that excessive-force claims and negligence claims may coexist.  See, e.g., Kearney v. Griffin, Civ. No. 03-3343, 2004 WL 1875015, at *2-3 (D. Minn. Aug. 20, 2004) (Kyle, J.).

to effect an arrest is a discretionary decision.  See, e.g., Kuha v. City of Minnetonka, 365 F.3d 590, 608 (8th Cir. 2003), abrogated on other grounds by Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385 (8th Cir. 2007) (*en banc*); Hyatt v. Anoka Police Dept., 700 N.W.2d 502, 508 (Minn. Ct. App. 2005).  The question, then, is whether there exists sufficient evidence to create a genuine issue that the officers' conduct amounted to a "willful or malicious wrong."

"In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, *the willful violation of a known right*.'"  Brown, 574 F.3d at 500-01 (emphasis added) (quoting Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991)).  For the reasons set forth above, McClennon cannot show that the officers violated a *known right* in "negligently" inflicting excessive force, because it was not clearly established on December 20, 2006, that causing *de minimis* injuries violated the law.  Accordingly, the Court concludes that Defendants are entitled to official immunity on McClennon's negligence claim.[12]

---

[12] Generally speaking, when a government official is entitled to official immunity, his employer receives the same benefit through the doctrine of "vicarious official immunity."  See, e.g., Johnson v. Carroll, __ F.3d __, 2011 WL 4634221, at *7 (8th Cir. Oct. 7, 2011) (citing Pletan v. Gaines, 494 N.W.2d 38, 42 (Minn. 1992)).  Hence, because the officers' discretionary actions here "are entitled to official immunity, the City has no vicarious liability."  Hayek v. City of St. Paul, 488 F.3d 1049, 1057 (8th Cir. 2007).

### III. Hofius must be dismissed

Finally, Hofius asserts that he must be dismissed from this action because he has never been served with process. (See Def. Mem. at 35-36.) McClennon did not respond to this argument in his brief, and at oral argument he acknowledged that Hofius should be dismissed because more than 120 days have elapsed since the Complaint was filed, without valid service. See Fed. R. Civ. P. 4(m); Mack v. Dillon, 594 F.3d 620, 622 (8th Cir. 2010) (*per curiam*). Accordingly, the Court will dismiss all claims against Hofius.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 14) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Motion is **GRANTED** as to all claims against Hofius, and those claims are **DISMISSED WITHOUT PREJUDICE** due to McClennon's failure to timely effect service;

2. The Motion is **GRANTED** with respect to McClennon's claims for excessive force (Count II), malicious prosecution (Count III), abuse of process (Count IV), false imprisonment (Count V), and negligence (Count VI), and those claims are **DISMISSED WITH PREJUDICE**; and

3.   The Motion is **DENIED** with respect to McClennon's unlawful-seizure claim (Count I).[13]

Date: October 31, 2011                              s/Richard H. Kyle
                                                     RICHARD H. KYLE
                                                     United States District Judge

---

[13] As indicated at oral argument, the Court is contemplating moving this action from the February 2012 trial calendar to the January 2012 trial calendar, as all discovery is complete and the case is trial-ready. In the event the parties are unable to resolve this case at the settlement conference before Magistrate Judge Keyes (which is also scheduled for January but which the Court will request that Judge Keyes move to December), they should be prepared to try this action sometime in January 2012.